**UNITED STATES, Appellee,**

v.

**Stephen Joseph WALKER,
Defendant, Appellant.**

**No. 90–1575.**

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1990.

Decided Jan. 10, 1991.

Robert A. Levine, Portland, Me., by appointment of the Court, for defendant, appellant.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., and Paula D. Silsby, Portland, Me., Asst. U.S. Atty., were on brief for appellee.

Before SELYA, Circuit Judge,
BOWNES, Senior Circuit Judge, and
ATKINS,* Senior District Judge.

* Of the Southern District of Florida, sitting by    designation.

ATKINS, Senior District Judge.

Defendant Walker appeals from his conviction in the district court. Walker entered a conditional plea of guilty to a single-count indictment charging him with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(1). Walker's conditional plea of guilty was entered under an agreement with the government that Walker reserved the right to appeal the denial of his motions to suppress and dismiss. We affirm the denial of Walker's motion to suppress finding that the district court correctly applied the standards set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny. We also affirm the denial of Walker's motion to dismiss finding that there was no violation of the Interstate Agreement on Detainers Act (hereinafter "IAD"). We affirm the conviction.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Facts*

Early in the morning of August 19, 1987, Detective Sergeant Stephen Lyons (hereinafter "Officer Lyons"), a seven-year veteran of the Westbrook Police Department, was on patrol alone in a marked police cruiser on the north side of Westbrook, Maine. At approximately 2:30 a.m., Officer Lyons drove past C.R. Wood, a lumber and construction materials business and noticed a trailer and a cab detached from the trailer, in the C.R. Wood parking lot. The trailer appeared to be loaded with lumber and was parked near the back of the building in a dimly lit and wooded area. He became curious and decided to get a closer look, knowing there had been early morning break-ins in this area in the past, and also realizing that never in his four years patrolling this area had he ever seen an early morning delivery made at C.R. Wood.

As he drove closer to the C.R. Wood parking lot, Officer Lyons first saw a very tall heavyset man in blue jeans with a rather scruffy appearance sitting down facing the fence of the parking lot. Officer Lyons then noticed another man approximately five-feet nine inches tall moving in the cab. Knowing that burglars often operated in pairs with one diverting attention away from the area while the other perpetrates the crime, Officer Lyons became more apprehensive and decided to investigate. The presence of out-of-state license plates on the tractor-trailer heightened his suspicions and Officer Lyons sent a radio message to police headquarters communicating his intentions to stop two dubious men at C.R. Wood at this early hour of the morning.

When Officer Lyons pulled up and parked in front of the cab, the large man, later identified as Walker, approached the police cruiser. The other man, later identified as Chrispman, climbed down from the cab and also approached. In response to Officer Lyons' questions as to what they were doing, one of the two men explained that they were delivering wood to C.R. Wood and since they arrived after closing time, they had to wait until the next morning to deliver the lumber. The two men had planned to sleep in their trailer cab which was equipped with a sleeping compartment.

Initially, Officer Lyons remained in his police cruiser as he questioned the two men. In response to Officer Lyons' request for documented proof of their purpose and identification, Walker produced his identification, while Chrispman told the Officer that he would get his, as he simultaneously began walking toward the cab. At this point Officer Lyons thought Chrispman was acting evasively by asking to return to the cab. The large size and unkempt appearance of Walker also increased the officer's concern for his safety and he told the two men that he was getting somewhat uneasy and was going to perform a frisk.

As the frisk was beginning, another officer arrived on the scene. During the frisk, a gun was found in Walker's right front shirt pocket. When it was later learned that Walker had prior felony convictions for armed robbery, he was charged with possession of a firearm by a convicted felon.

## B. *Procedural History*

The indictment against Walker was returned on February 15, 1989. On October 17, 1989, on the Government's petition, a writ of habeas corpus *ad prosequendum* was issued. On November 17, 1989, Walker appeared for arraignment before a Magistrate and he consented to be detained pending trial and was remanded to the Marshal's custody. On December 11, 1989, Walker filed a motion to extend the time for filing motions.

Walker's motion to suppress the gun was filed December 19, 1989 and a hearing before the Magistrate was held on January 16, 1990. The Magistrate issued a report on February 15, 1990 recommending that the motion to suppress be denied. The Magistrate found that the weapon was discovered as a result of a stop and frisk based on articulable suspicion. On February 23, 1990, Walker filed objections to the Magistrate's proposed recommendation. The district court entered an order on March 30, 1990 adopting the Magistrate's recommendation after making a *de novo* determination. The district court denied the motion to suppress finding no further proceedings necessary.

On March 15, 1990, Walker filed a motion to dismiss the indictment. He claimed that more than 120 days had elapsed since November 9, 1989, when he was brought from Maine to Maryland, where he was serving a sentence for violation of probation. In essence, he argued that his rights under the IAD enacted by the State of Maine had been violated. The government took the position that any delay which is lawful under the Speedy Trial Act also operates to stop the clock for IAD purposes. Therefore, in view of the various motions that Walker filed, only 30 days had run toward the 120 day limit. The district court entered its order on March 30, 1990 denying the Motion to Dismiss finding that only 30 chargeable days under the IAD had expired due to motions filed by the defendant.

On April 4, 1990, Walker entered a conditional plea of guilty to the indictment under an agreement with the Government. Walker reserved the right to appeal the denial of his motion to suppress and motion to dismiss. Both parties reserved the right to recommend any lawful sentence authorized by law. The plea, and later the plea agreement, were accepted.

## II. DISCUSSION

### A. *Walker's Motion to Suppress*

Walker argues that there was lack of articulable suspicion to perform the stop and lack of reasonable belief that Walker was in possession of a weapon. We review the district court's finding as to the inferences reasonably drawn from the facts and circumstances presented at the suppression hearing under the clearly erroneous standard. *See, e.g., United States v. Stanley*, 915 F.2d 54, 57 (1st Cir.1990); *United States v. Figueroa*, 818 F.2d 1020, 1024 (1st Cir.1987); *United States v. Wiseman*, 814 F.2d 826, 827–828 (1st Cir.1987).

The question of whether an officer has reasonable grounds to "stop" and to "frisk" falls directly within the Fourth Amendment's proscription against unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 16, 20, 88 S.Ct. 1868, 1877, 1879, 20 L.Ed.2d 889 (1968). The Supreme Court stated that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880.

In determining the reasonableness of a *Terry* stop, "the court must first consider whether the officer's action was justified at its inception; and, second, whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place." *Stanley*, 915 F.2d at 55 (citations omitted). When applying this familiar two-prong test, the court must view the circumstances relating to the stop and frisk as a whole. *Id.*

First, we turn to the determination of whether the police action was justified at its inception. We continue to recognize that this determination depends on the to-

4

tality of the circumstances confronting the officer, *United States v. Trullo*, 809 F.2d 108, 111 (1st Cir.), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987), and that "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch', but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Stanley*, 915 F.2d at 56 (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883).

■ The circumstances in this case clearly support that Officer Lyons had reasonable suspicion that a crime was afoot. The magistrate's report, later endorsed by the district court, found that the area had a history of crime. The magistrate's report found that:

> [i]t was entirely reasonable for Officer Lyons to have approached the defendant and Chrispman in connection with his investigation of possible criminal behavior. Their presence at 2:30 a.m. near a trailer rig loaded with wood and a detached cab was clearly suspicious, especially so in light of Officer Lyons' knowledge of previous burglaries at this same site and elsewhere in the area.

Recommended Decision on Motion to Suppress (February 15, 1990), at 5. We agree. The type of area in question is clearly a consideration officers use in deciding to make a "Terry" stop. *See Stanley*, 915 F.2d at 56; *Trullo*, 809 F.2d at 111. Officer Lyons testified that he knew there had been early morning break-ins in this area in the past.

In addition to this general factor, there were other particular facts that gave rise to Officer Lyons' impression that a crime was in progress. It was 2:30 a.m. and Officer Lyons had patrolled this area for 4 years and never before had noticed an early morning delivery made at C.R. Wood. The trailer, which was loaded with lumber, was parked in a dimly lit area in the back of the building, as if in an effort to be concealed. The fact that the trailer had out-of-state license plates also caused Officer Lyons to question whether any illegal activity was going on. Such facts would permit a reasonable officer with Officer Lyons' experience to conclude that a burglary was in progress or that a legitimately loaded trailer might be in the process of being attached to a pirate cab.

Having determined that Officer Lyons' actions were justified at the inception, we turn to the question of whether the stop and frisk was reasonably related in scope to the circumstances which justified the inference in the first place. In regard to this inquiry, the Supreme Court has made clear that in regard to a frisk for weapons "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. Therefore, Officer Lyons' concerns for his own safety is of paramount importance in assessing the appropriateness of the action taken.

Officer Lyons testified at the suppression hearing that he had a great concern for his safety at the time he conducted the weapon search, based on his belief that either the defendant or Chrispman may have been armed. His knowledge of the prior burglaries in the area led to his concern that these two leery men were involved in a burglary in progress at this early hour of the morning. The dimly lit area where the officer was questioning the two men heightened his skepticism. More importantly, his experience that burglars often carry weapons or other dangerous objects and the evasive conduct on the part of Chrispman when asking to return to the cab to get his identification, clearly support Officer Lyons' concern for his safety and suspicions that these men might be armed. When viewing the totality of all the circumstances, we find that Officer Lyons' actions in this case were reasonably related in scope to the circumstances which justified the original stop and therefore did not violate the defendant's Fourth Amendment rights.

**B.** *Walker's Motion to Dismiss*

■ Walker's motion to dismiss asserted that his right under the IAD to be brought

to trial within the 120–day time period was violated. Walker arrived on November 9, 1989 in the District of Maine and he disputes the government's contention that the time between Walker's filing of his various motions and the courts resolution of those motions were properly excluded from the 120–day time period.

The IAD sets forth the procedures for temporarily transferring a prisoner incarcerated in one jurisdiction to the custody of another jurisdiction to resolve criminal charges pending in the receiving jurisdiction. *United States v. Taylor*, 861 F.2d 316, 318 (1st Cir.1988). "[T]he agreements motivating purpose [is] to be encouragement of the 'expeditious and orderly detention' of outstanding charges." *Id.* at 318 (quoting Art. I.) Article IV(c) of the IAD provides that "[i]n respect to any proceeding made possible by this article, trial shall be commenced within 120 days of the arrival of the prisoner in the receiving state ..." However, the article also provides that:

> (a) In determining the duration and expiration of dates of the time periods provided in Article III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction on this matter. (emphasis supplied).

Courts have consistently applied this language "to exclude all those time periods of delay occasioned by the defendant." *Taylor*, 861 F.2d at 321 (citations omitted). Moreover, the time it takes the court to resolve matters raised by the defendant, have been held by the courts to not be chargeable in the 120–day time limitation. *Id.*

This circuit has also held that a defendant's motion will toll the IAD clock until the court resolves the motion when:

> (a) the prisoner fails to alert the court to the IAD's applicability, (b) the time taken by the court for resolving the matter would be excluded under the Speedy Trial Act, and (c) the delay is neither in bad faith nor offensive to notions of justice. *Id.* at 322.

The IAD clock in this case began to run on November 9, 1989 when Walker arrived in the District of Maine. *See* Article IV(c). On December 11, 1989, 32 days later, Walker filed a motion to extend the time for filing his pretrial motions. This motion, like the subsequent suppression motion, did not refer to the IAD. It was granted on December 12, 1989. Under the Speedy Trial Act, 18 U.S.C. § 3161(h)(1)(F), "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excluded from computation. This Court has consistently held that the filing a motion stops the clock under the Speedy Trial Act. *See United States v. Rush*, 738 F.2d 497, 502 (1st Cir. 1984); *United States v. Mitchell*, 723 F.2d 1040, 1046–47 (1st Cir.1983).

On December 19, 1989, the IAD clock was also stopped when Walker filed his motion to suppress. On February 15, 1990, the Magistrate issued his recommended decision to deny the motion to suppress, but since the decision does not become final until the district court acts on it, the IAD clock continued to be stopped. The defendant's request for a *de novo* review of the Magistrate's recommendations was another independent event which stopped the tolling of the IAD clock. Therefore, it was not until March 30, 1990 when the district court issued its order, that the IAD clock began to run again. By the time Walker asserted his rights under the IAD on March 15, 1990, only 30 to 32 days could be chargeable to his 120–day time period.

We note that the time required to resolve the pretrial motions that stopped the IAD clock in this case was neither extended in bad faith nor offensive to notions of justice. *See United States v. Taylor*, 861 F.2d at 322. Based on the above, we find that less than 35 days were chargeable to the time limit under the IAD clock and

therefore Walker's rights under the IAD were not violated.[1]

*We affirm the conviction.*

---

1. In view of the foregoing, we, like the *Taylor* panel, need not decide whether the Speedy Trial Act's method of measuring elapsed time would be applicable had either of the defendant's 1989 motions specifically referenced the IAD.